IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHWESTERN DIVISION

| | | |
|---|---|---|
| VEDA STONE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | 11-5039-CV-SW-REL-SSA |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Veda Stone seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under Titles II and XVI of the Social Security Act ("the Act"). Plaintiff argues that (1) the ALJ improperly formulated plaintiff's residual functional capacity, (2) the decisions made on remand went beyond the scope of authority since the remand order dealt only with fibromyalgia, (3) the ALJ failed to develop the record by obtaining additional medical evidence as to whether plaintiff met Listing 12.07 for somatoform disorder,[1] (4) the ALJ improperly rejected plaintiff's testimony that she cannot sit for more than 15 to 20 minutes at a time, and (5) the ALJ failed to consider the impact of plaintiff's obesity on her ability to work. I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

---

[1]Somatoform disorders represent a group of disorders characterized by physical symptoms suggesting a medical disorder. However, somatoform disorders represent a psychiatric condition because the physical symptoms present in the disorder cannot be fully explained by a medical disorder, substance use, or another mental disorder.

## I.  BACKGROUND

On July 15, 2003, plaintiff applied for disability benefits alleging that she had been disabled since September 1, 1999.  Plaintiff's disability stems from fibromyalgia and neck problems.  Plaintiff's application was denied initially and on reconsideration. On February 2, 2005, a hearing was held before Administrative Law Judge Linda Carter. On April 20, 2005, the ALJ found that plaintiff was not under a "disability" as defined in the Act.  In November 2005 the Appeals Council denied plaintiff's request for review. On January 3, 2006, plaintiff filed an action in federal district court appealing the agency's decision.  Veda Stone v. Jo Anne Barnhart, 06-5001-CV-SW-NKL.  Upon the request of agency counsel, the Appeals Council reconsidered its decision and requested remand and reversal pursuant to sentence four of section 205(g), 42 U.S.C. § 405(g). On June 13, 2006, United States District Judge Nanette Laughrey granted the Commissioner's request (Tr. at 417-419).  Upon receiving the district court's order, the Appeals Council vacated the ALJ's April 20, 2005, decision and remanded the case for further proceedings (Tr. at 422-424).

A supplemental hearing was held before Administrative Law Judge Susan Blaney on June 20, 2008, which included medical expert testimony.  On September 30, 2008, the ALJ found plaintiff not disabled (Tr. at 394-403).  The Appeals Council denied plaintiff's request for review on February 24, 2011.  Therefore, the September 30, 2008, decision stands as the final decision of the Commissioner.

## II.  STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal

district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental

3

impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.      Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.      Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.      Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.      Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes = go to next step where burden shifts to Commissioner.

4

5.     Does the impairment prevent the claimant from doing any other work?

>     Yes = disabled.
>     No = not disabled.

## IV.    THE RECORD

The record consists of the testimony of plaintiff, vocational expert Barbara Myers, medical expert Robert Karsh, M.D., and documentary evidence admitted at the hearing.

### A.    ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

### Earnings Record

Plaintiff earned the following income from 1987 through 2004:

| Year | Income | Year | Income |
|------|--------|------|--------|
| 1987 | $  513.21 | 1996 | $  2,532.44 |
| 1988 | 2,314.65 | 1997 | 42.63 |
| 1989 | 1,628.97 | 1998 | 4,565.39 |
| 1990 | 67.80 | 1999 | 1,355.40 |
| 1991 | 0.00 | 2000 | 832.60 |
| 1992 | 0.00 | 2001 | 0.00 |
| 1993 | 2,518.62 | 2002 | 0.00 |
| 1994 | 1,201.45 | 2003 | 0.00 |
| 1995 | 4,106.87 | 2004 | 0.00 |

(Tr. at 69).

### Disability Report - Field Office

On July 25, 2003, plaintiff met with a disability counselor who observed no difficulty with hearing, reading, breathing, understanding, coherency, concentrating, talking, answering, sitting, standing, walking, seeing, using her hands, or writing (Tr. at

5

75).  "She was at my desk for 1 1/2 hours without standing, but she did appear to be in pain." (Tr. at 76).

**Claimant Questionnaire**

In a Claimant Questionnaire completed on August 1, 2003, plaintiff reported that she is able to prepare Hamburger Helper, frozen pizzas, chicken, macaroni and cheese, mashed potatoes, hamburgers and fries, tacos, steaks, and vegetables (Tr. at 94). Plaintiff can dust and she can fold clothes, but she must sit while doing that (Tr. at 94). It now takes plaintiff four months to crochet a blanket when she used to be able to finish one in a month (Tr. at 95). She drives about eight miles twice a week. She goes out to eat for about an hour once in a while, and she takes her kids to the drive in for two hours.

**B.    SUMMARY OF TESTIMONY**

During the February 2, 2005, hearing, plaintiff testified as follows:

Plaintiff was born in May 1971 and was 33 at the time of the administrative hearing (Tr. at 496).   She has a high school education and can read and write without difficulty (Tr. at 496).  Plaintiff was 5'2" tall and weighed 116 pounds[2] (Tr. at 496). Plaintiff has a driver's license but her husband drove her to the hearing (Tr. at 497).  She can drive short distances to run errands, but for long distances her husband drives her (Tr. at 497).

Plaintiff has three children who, at the time of this hearing, were 14, 12 and 10 (Tr. at 510).  She does not take her kids to school or pick them up; she is not able to

---

[2]I assume this is a typographical error -- plaintiff argues she suffers from obesity, and her medical records list her weight at generally 150 or above.  I also note that the hearing transcript is fraught with typographical errors and misspellings.

6

participate in any activities at school with them such as plays or parent/teacher meetings (Tr. at 510). Plaintiff does not exercise, but she did physical therapy back in 2000 when she was hurt on the job (Tr. at 510). After the injury, plaintiff was diagnosed with fibromyalgia and protruding disc in her neck, and she was awarded a worker's compensation settlement (Tr. at 510-511).

Since plaintiff's alleged onset date of September 1, 1999, she worked in 2000, she filled out applications, and she babysat her nephew a few years ago (Tr. at 497). When he started getting bigger, she could not pick him up due to her back (Tr. at 497). Plaintiff last applied for a job in 2002 (Tr. at 497).

Plaintiff suffers from bad headaches and pain in her legs, necks and arms (Tr. at 499). Her hands feel like they are swollen and they go numb (Tr. at 499). Plaintiff has been diagnosed with fibromyalgia and migraine headaches (Tr. at 499). The pain in her legs is caused by cold weather, walking up stairs, or walking around in a store (Tr. at 499). She also experiences pain when she is not doing anything (Tr. at 499). She described her pain as an 8 out of 10 without medication and a 6 out of 10 with medication (Tr. at 499-500). Humidity causes leg pain as well (Tr. at 500).

Plaintiff's neck pain lasts every day most of the day (Tr. at 500). She rated her neck pain a 7 or 8 without medication and a 4 or 5 with medication (Tr. at 500).

Plaintiff has arm pain and "half the time" when she tries to pick up a gallon of milk she drops it, and she drops dishes and other things because of her arm pain (Tr. at 501). Plaintiff's arm pain is a 10 out of 10 in the morning (Tr. at 501). A couple hours after she takes her medication, the pain is reduced to a 5 out of 10 (Tr. at 501).

7

Plaintiff's hands swell and go numb for about an hour or two every day (Tr. at 502). Her carpel tunnel syndrome tests were negative; her doctors think the hand problems may be due to fibromyalgia (Tr. at 502). Whenever she tries to make a fist, her hands go numb (Tr. at 502). Her hand pain is about a 7 out of 10 without medication and a 5 out of 10 a few hours after taking medication (Tr. at 502-503). Plaintiff's hands swell and hurt when she does dishes or brushes her hair (Tr. at 503). She can use her hands for 30 to 40 minutes before the pain starts (Tr. at 503). Whenever she grips something, her hands feel numb and she will drop the item (Tr. at 503). This occurs four or five times a week, and plaintiff has broken a lot of her dishes by dropping them (Tr. at 504). She has to have her husband fasten her bra and tie her shoes for her (Tr. at 504). She cannot pick up small items like coins (Tr. at 504).

Plaintiff has headaches two or three times a week, but before she started on her headache medicine (Atenolol) she got them constantly (Tr. at 504). She started taking that medication in November 2004 (Tr. at 504). Plaintiff's migraines last about three hours (Tr. at 505). When she gets a headache, she lies down in her bedroom and covers her eyes (Tr. at 505).

Plaintiff can sit for 15 to 20 minutes at a time and needs to keep her feet propped up (Tr. at 506). She could probably sit for four hours a day if she was able to get up and stretch (Tr. at 507). She can stand for 30 minutes before needing a break and for a total of three hours a day (Tr. at 507). She can walk for ten minutes at a time (Tr. at 507). Plaintiff needs to lie down three times a day for about 30 minutes each time (Tr. at 507-508).

Plaintiff's medication makes her drowsy, she gets "really bad" stomach aches, and she cannot remember things (Tr. at 498). If she takes her medication at night instead of in the morning, her stomach is not so bad (Tr. at 498). She believes her medication is making her teeth break but she has not gone to the dentist in a while because she cannot afford to go (Tr. at 505). Plaintiff cannot remember how to do her ten-year-old's homework, and she forgets what someone says when she gets a phone call (Tr. at 505). She has left the stove on several times because she forgets that it is on (Tr. at 505). Plaintiff also loses concentration when her kids are trying to tell her something (Tr. at 508).

During the June 20, 2008, hearing, plaintiff testified; and vocational expert Barbara Myers and medical expert Robert Karsh, M.D., also testified.

**1.     Plaintiff's testimony.**

Plaintiff saw a rheumatologist in January 2006 but has not seen one since then (Tr. at 663). Her alleged onset date of September 1, 1999, was when she was unable to go to work because of her conditions, even though that was after her last insured date (Tr. at 668). At the time of the hearing, plaintiff was 37 years old and living with her husband and three children, ages 17, 16 and 14 (Tr. at 686-687). Plaintiff's husband works in a factory (Tr. at 699).

Plaintiff tried to return to work in 2000 but was unable to bend over, clean, vacuum, pull up laundry, or push a cart (Tr. at 687-688). Her neck hurt and the pain went down her back (Tr. at 688).

Plaintiff received $3,300 for the 8.2% whole body rating on her worker's compensation claim (Tr. at 688-689). Plaintiff previously worked in housekeeping at a

hospital and at a nursing home (Tr. at 690-691).  Plaintiff worked at Best Western Rambler Motel as a dishwasher and cook for more than six months, although she only earned $2,500 -- she quit that job when she got pregnant (Tr. at 691).  She worked at Nevada Care Centers for six months or more, but only earned $2,793 (Tr. at 692).

Plaintiff has a high school education (Tr. at 689).  She has never been to the Missouri Department of Vocational Rehabilitation and has never tried to perform a sit-down job (Tr. at 689-690).  Sitting in chairs bothers her back and her legs unless she has her feet up (Tr. at 690).

Plaintiff can stand for about five minutes before her back starts hurting and she has to sit down (Tr. at 692).  Plaintiff can walk no more than half a city block because her legs, back, hips and knees hurt (Tr. at 693).  In September 1999 plaintiff was not having problems with her legs, knees, arms and hips, but her feet hurt (Tr. at 693-694).  Her condition has worsened  and started affecting her in 2002 (Tr. at 693-694).  She can lift a half a gallon of milk, she can sit for 10 to 15 minutes (Tr. at 694).  Bending over causes her pain -- if she drops something, she has to bend down and support her knees or sit down in a chair and bend down to get it (Tr. at 694-695).

Plaintiff is a smoker but does not have difficulty breathing (Tr. at 695).  She gets up around 6:00 a.m., gets her kids up and off to school, takes her medicine, lies down until around 9:30 because her medicine makes her drowsy, takes a shower, gets dressed, sits for about 30 minutes with her legs up, watches television, does some dishes about five minutes at a time, and tries to dust (Tr. at 697-698).  Her husband cooks, her kids do most of the dishes and they vacuum (Tr. at 698).  Plaintiff can drive, but she only drives about eight miles (Tr. at 698).  Plaintiff used to crochet but cannot any longer

10

due to her hand pain (Tr. at 699). She last crocheted about three or four years ago (Tr. at 699). She used to fish, but has not done that in about three years (Tr. at 699). Plaintiff goes shopping with her children if she is having a good day (Tr. at 700). Her husband shops for groceries and sometimes her children shop for her (Tr. at 700).

Plaintiff's back pain is daily, and she rated it a 7 out of 10 in intensity (Tr. at 700). Lying down makes it better, and when she sits she has to have her feet up and she uses a heating pad (Tr. at 701). Cold weather, bending, walking and standing too long cause her increased back pain (Tr. at 701). If she moves wrong, she gets sharp pains in her neck (Tr. at 701). Her neck bothers her about three to four times a week (Tr. at 701). Her neck pain is exacerbated by any kind of movement, standing, pulling or pushing, or picking things up (Tr. at 701-702). She also alternates heat and cold (Tr. at 702). When plaintiff's neck hurts, the pain radiates into her right arm and she cannot move it (Tr. at 707). This happens about twice a week (Tr. at 707). Plaintiff gets hip pain from walking or bending over (Tr. at 704). Sometimes her husband has to help her out of bed due to hip pain (Tr. at 704). Plaintiff's hip pain is a 10 out of 10 in severity (Tr. at 704).

Plaintiff gets migraines when the weather changes (Tr. at 702). Plaintiff has migraine headaches four to five times per week (Tr. at 702). When she gets a migraine headache, she has to be in a room with no noise, she puts plugs in her ears, she puts ice packs on her head, she turns on a fan to keep the air going, and she puts up blankets to keep the light out (Tr. at 703-704). Plaintiff throws up when she has migraine headaches (Tr. at 707).

Plaintiff's hands swell and get tingly, and she drops things easily because she cannot tell if she is holding onto something (Tr. at 705). This happens when she writes a

11

lot or when the weather is humid or cold or hot (Tr. at 705).

Plaintiff has five to six bad days a week (Tr. at 705). On bad days, her pain is a 10 out of 10 in severity (Tr. at 706). On a bad day, she cannot get in the shower, she cannot brush her hair, she cannot get dressed (Tr. at 706). On bad days, her daughter helps her get dressed (Tr. at 706).

Plaintiff does not exercise, even though Dr. Kim has told her to (Tr. at 708). She tries to exercise by walking, but she can only walk a half a block (Tr. at 708). She did not participate in physical therapy like a rheumatologist recommended (Tr. at 708-709). She refused a physical therapy referral because she had tried it before and it made her back and neck worse (Tr. at 709). Plaintiff has done stretching exercises, but they do not help (Tr. at 710).

## 2. Medical expert testimony.

Medical Expert Robert Karsh, M.D., testified at the request of the Administrative Law Judge. Dr. Karsh is board certified in internal medicine and rheumatology (Tr. at 669). After reviewing plaintiff's medical records, Dr. Karsh found that she suffers from neck and back pain since a 1999 injury; vomiting , nausea, dehydration, and diarrhea on one occasion; and "fibromyalgia which has no listing but it's closest relative is somatoform disorder, 12.07" (Tr. at 672). When asked why it was closest to somatoform disorder, Dr. Karsh testified that, "[F]ibromyalgia is a condition for which there are no findings, no objective findings, and which is associated with depression and stress, and the same thing history of somatoform disorder. I'm not saying that fibromyalgia is a somatoform disorder, but that's the closest thing in the listing to it." (Tr. at 672).

Plaintiff has a bulging disc -- an October 4, 2004, MRI of her cervical spine showed findings of osteoarthritis and a disc bulge, but there was no stenosis[3] or narrowing of the parameter where the nerves exit (Tr. at 672-673). "That is important, because to satisfy disorders of the spine, you have to show evidence of nerve root compression. And that was not present here. You also have to show that there is a loss of motor function, and muscle weakness resulting from this, and that was not true here either." (Tr. at 673). Although there is mention in a medical record of a herniated disc,[4] that record was written by a nurse, not a doctor, and there are no x-rays or MRIs that confirm such a diagnosis; therefore, Dr. Karsh testified that it is not an accurate diagnosis (Tr. at 681-684).

Plaintiff had a few hospitalizations for gastroenteritis;[5] however, "[t]hey did not specify whether this was due to stress and nerves, which can certainly do the same thing, or whether this was due to a virus or a bacterial infection" (Tr. at 674-675).

Dr. Karsh explained the condition of fibromyalgia:

It was . . . a new word coined in 1990 by several experts who felt that they had a number of patients who suffered from chronic diffuse pain, but that were somehow different in that they didn't like to be poked. And so they said, maybe we have a new disease here.

---

[3]Cervical stenosis is a narrowing of the spinal canal in the neck area or upper part of the spine. This narrowing places pressure on the spinal cord.

[4]The bones (vertebrae) that form the spine are cushioned by round, flat discs. When these discs are healthy, they act as shock absorbers for the spine and keep the spine flexible. If they become damaged, they may bulge abnormally or break open (rupture), in what is called a herniated or slipped disc.

[5]Gastroenteritis is a condition that causes irritation and inflammation of the stomach and intestines (the gastrointestinal tract).

13

And they said there were 18 trigger points, which if you press with at least four kilograms of pressure, that's eight point eight pounds of pressure, the patient said that that was painful. Not that it was just tender, but it had to be painful. And they felt this was something different.

They recognized that it often overlapped with fatigue, with irritable bowel, with sleep disorders, and with stress. And they also recognized that there were no objective findings. Indeed, the 18 trigger points were not objective findings because it depended upon the response, a subjective response of the patient, who says, yes it hurts in those areas.

So it turned out to be a rather common, nonarticular disorder of unknown cause, characterized by achy pain, stiffness and sore muscles, and areas of the tendon insertions as well as the muscles, and adjacent soft tissue. The diagnosis is purely clinical. Treatment includes exercise, local heat, and drugs for pain and for sleep.

It is [exacerbated] by environmental or emotional stress, by poor sleep, by trauma, by exposure to dampness or cold, or by a doctor who tells a patient that it's quote, all in your head. That always makes it worse too.

Now, if it's anything different from chronic pain, that is suffered by many people. The leader of the group that formulated this in 1990 was a Dr. Frederick Wolf. And there as an article quoting him on the January 14, 2008, New York Times. And what Dr. Wolf said was, quote, some of us, in those days, thought that we had actually identified a disease which this clearly is not. And I go on to quote him, To make people ill. To give them an illness was the wrong thing. Unquote.

And so he has sort of abdicated a diagnosis that he formulated, and believes now that it is a chronic pain syndrome that is closely related to stress.

(Tr. at 676-677).

Dr. Karsh testified that chronic pain syndromes are made worse by excessive heat or cold, dampness or excessive humidity (Tr. at 679). There are no other limitations caused by plaintiff's fibromyalgia (Tr. at 679).

Chronic pain syndrome consists of complaints of pain for six months; fibromyalgia is a chronic pain syndrome (Tr. at 680). There are no objective findings for chronic pain syndrome other than one that is caused by something that can be

diagnosed, such as the chronic pain that lasts for some time after someone has shingles (Tr. at 680-681).

### 3.    Vocational expert testimony.

Vocational expert Barbara Myers testified at the request of the Administrative Law Judge.   The first hypothetical involved a person who cannot work in extreme hot or cold and could not work in extreme humidity such as outdoors (Tr. at 713).  The vocational expert testified that such a person could not perform plaintiff's past relevant work as a kitchen worker, but she could be a hospital cleaner (Tr. at 713).  There are cleaning positions which are light (the hospital cleaner is a medium-level job), D.O.T. 323.687-014, with 4,000 jobs in Missouri and 175,000 in the country (Tr. at 713).

If a person could stand and walk for six hours per day and sit for six hours per day but could not work in extreme hot or cold or extreme humidity, he could lift 20 pounds occasionally and 10 pounds frequently, he could perform the job of light cleaner (Tr. at 714).

The next hypothetical involved a person who could sit six hours per day, stand and walk two hours per day but no prolonged walking, could lift ten pounds occasionally and five pounds frequently, could not work around extreme cold or heat and no extreme humidity (Tr. at 714). The vocational expert testified that the person could not perform any of plaintiff's past relevant work, but the person could be an order clerk, sedentary and unskilled, D.O.T. 209.567-014, with 1,000 jobs in Missouri and 75,000 in the country (Tr. at 714).  The person could also work as an optical goods assembler, also sedentary and unskilled, D.O.T. 713.687-018, with 500 in Missouri and 65,000 in the country (Tr. at 715).  The person could worker as a credit checker, sedentary and

15

unskilled, D.O.T. 237.367-014, with 400 in Missouri and 50,000 jobs in the country (Tr. at 715). All of these jobs include a 10- to 15-minute break in the morning and afternoon and a 30-minute lunch break (Tr. at 715).

If a person had to lie down five days a week due to headaches, he could not work (Tr. at 715).

If a person could only occasionally stoop, it would not affect the answers to the hypotheticals above (Tr. at 716).

Plaintiff's attorney asked the vocational expert if a person who was limited in moving her head up and down could perform those jobs (Tr. at 716). The vocational expert responded, "I guess the only way I can answer that is, the jobs would require her to look down. You know, and I wouldn't necessarily say moving it up and down would be required, but in order to look down at your task, she would be looking down more than a third of the day" (Tr. at 716-717).

If the person could only sit for 30 minutes at a time before needing to get up, he could still perform the jobs mentioned above (Tr. at 717).

## C. SUMMARY OF MEDICAL RECORDS

On August 3, 1999, plaintiff was examined at Nevada Medical Clinic (Tr. at 134). "Veda was trying to lift up some laundry from a wastebasket or trash basket. The sack adhered to the edges and she was using both hands to pull up. She sustained some discomfort in the upper neck and back area. At the end of the day she had a headache and then she woke up today with severe stiffness in her neck. She tried to go to work but it was stiffening up and radiating down the left arm area. She has no weakness in the extremities, however." Plaintiff had good range of motion in her shoulders and

16

extremities, she had no neurosensory deficit, and she had good grip. She was diagnosed with cervical muscle strain. The doctor prescribed Flexeril, a muscle relaxer. She was told to stay off work "today and tomorrow but then return to work."

Three days later, on August 6, 1999, plaintiff returned for a recheck (Tr. at 134). She complained of continued pain and swelling. The doctor ordered x-rays "which look okay." The doctor told plaintiff to attend physical therapy for a couple of visits and follow up the following Monday to see if she was ready to return to work.

Five days later, on August 11, 1999, plaintiff returned to the Nevada Medical Clinic for a recheck (Tr. at 134). She reported that physical therapy was "only very slightly helpful" and she complained of continued pain. "It's very difficult to tell subjectively how much difficulty she is having. She appears to be having significant trouble with it." The doctor continued plaintiff on her muscle relaxer and physical therapy and recommended she see an orthopedic surgeon. "We will keep her off work until she sees him or she is getting better."

Five days later, on August 16, 1999, plaintiff returned for a follow up (Tr. at 134). She continued to report pain and stiffness. The doctor ordered blood work and told her to follow up "with Dr. Ellefsen at the earliest appointment." She was to continue her muscle relaxer and physical therapy.

September 1, 1999, is plaintiff's alleged onset date.

On October 15, 1999, plaintiff was seen by Matthew Karshner, M.D., for a second opinion (Tr. at 124-127).

She is a 28 year old . . . female who on 08/02/99, while lifting a bag of laundry out of a large garbage can or barrel, noted a twinge in her neck. Later that day, after finishing work and picking up her son, she noted pain in her neck. The next

17

day, she had increased pain in the neck, stiffness, feeling of swelling, which would worsen with moving either arm. She saw Dr. Deem; medications were prescribed but unfortunately the patient did not receive benefit. She then noted pain coming from her neck, going down her back, going to both hips, and down both legs. They would be worse with movement, somewhat better with rest, but would not go away. She noted that cold weather made her feel worse, and that she had swelling and tingling in the fingers, tingling in the backs of the legs, with worsening with prolonged positioning, and bending/lifting. Multiple regions hurt, including under the arm, and pectoral areas. She had problems sleeping, and noted redness on her neck both in the front and back, and was having problems holding on to objects. . . . Medications have . . . included Tylenol #3 [narcotic], muscle relaxer, along with Relafen,[6] Robaxin[7] and Valium[8] from Dr. Ellefsen, whom she saw afterwards. He ordered an MRI, as she was not getting better after physical therapy which included ice, electrical stimulation and movement of the legs without active strengthening. The MRI showed a small C5-6 disc protrusion by the report; she was scheduled for epidural steroid injection, has had two so far, and a third one is planned. She has not been to work since August.

Plaintiff was taking Valium, Soma (muscle relaxer), Lorcet (narcotic), and Relafen (non-steroidal anti-inflammatory). She was smoking 1 1/2 packs of cigarettes per day. Plaintiff reported working as a housekeeper doing heavy lifting. "The patient has been at Heartland for eight months by one report, two years by another. She has been off work since 08/29/99." Plaintiff weighed 150 pounds. She was alert, oriented, and cooperative. All her joint ranges of motion were normal; she had normal muscle strength. She had 12 of 18 positive tender points.

The patient's films are reviewed; the MRI shows a small disc bulge at C5-6 toward the right; all neuroforamina are widely patent, and no nerve root, nor the spinal cord is impinged.

Dr. Karshner assessed "probable fibromyalgia, but must rule out other possible cause."

---

[6]Non-steroidal anti-inflammatory.

[7]Muscle relaxer.

[8]Used to relieve anxiety and muscle spasms.

18

He recommended blood work and, if that came back negative, physical therapy "for an active stretching and strengthening program".  He recommended plaintiff continue with a muscle relaxer and also use a low-dose tricyclic antidepressant to help with pain and sleep.  "I believe she will be able to return to work in the near future, after the above recommendations are put in to motion.  I do not recommend any further epidural steroid injections, or any other imaging studies or invasive testing."

On October 29, 1999, plaintiff saw Dr. Karshner for a follow up (Tr. at 123).  She could not tolerate Flexeril, the muscle relaxer, due to nausea. She was sleeping better and felt a little better in general.  On exam she had a "decrease in the number of tender points."  In the areas where plaintiff had pain, the level of pain was improved.  Plaintiff's lab work was all normal.  Dr. Karshner assessed "fibromyalgia, improving" and switched plaintiff to Norflex instead of Flexeril.  "The patient may return to work, lifting five pounds at a time, dressing warmly, and avoiding drafts."

On January 10, 2000, plaintiff saw Dr. Karshner for a follow up (Tr. at 122).  "She has not returned to work; her husband is working."  Plaintiff complained of continued pain.  "She is no longer taking Amitriptyline,[9] is not on a muscle relaxer, and has not had any active physical therapy.  She now has an attorney, who apparently arranged for this appointment."

Dr. Karshner performed an exam which was essentially  normal.  "The patient exhibits significant anger and frustration throughout the interview, and is also confused, as she has been told that there are two cervical discs that are causing the problem.  Review of her MRI showed a disc bulge at C5-6, with no cord or nerve root compression.

---

[9]A tricyclic antidepressant.

Review of the patient's labs show they are all normal."  Dr. Karshner assessed probable fibromyalgia.  He said she would benefit from a muscle relaxer and again prescribed Norflex.  He also told her she should restart Amitriptyline.  "Modalities, combined with active physical therapy, are recommended at this time as well."  Plaintiff "appear[ed] not to fully accept the diagnosis or the treatment plan."

On March 6, 2000, plaintiff saw Dr. Karshner for a follow up (Tr. at 121).  Plaintiff reported that she was feeling no better.  She was taking the Norflex and Amitriptyline. She reported feeling depressed but was not taking any anti-depressants.  Plaintiff's physical exam was normal except she had a flat affect and multiple tender points.  Dr. Karshner assessed fibromyalgia and depression. He recommended plaintiff start Prozac.  "The patient may work with a five pound lifting restriction at this time."

On March 20, 2000, plaintiff saw Dr. Karshner for a follow up (Tr. at 120).  Her worker's compensation did not approve the Prozac so she did not take it.  Plaintiff was assessed with fibromyalgia and depression.  Plaintiff was told to continue the Amitriptyline and Norflex and Dr. Karshner gave her samples of Celexa.[10]  "I believe the patient can work lifting five pounds; if there is no work for her at this level, she is off work."

On April 28, 2000, plaintiff saw Dr. Karshner for a follow up (Tr. at 119).  "She ran out of Celexa, Amitriptyline and Norflex and did not call.  She went to the ER last week and received Tylenol #3 [narcotic] and generic Flexeril [muscle relaxer]."  Plaintiff had normal joint ranges of motion and normal strength.  She had 11 positive tender

_____

[10]A selective serotonin reuptake inhibitor used to treat depression.

points. Dr. Karshner recommended plaintiff restart her medication. "Lifting and work restrictions are unchanged."

On May 22, 2000, plaintiff saw Dr. Karshner for a follow up (Tr. at 118). "Overall she feels better. She does get some increase in pain now and then with colder days. . . . Tender points number fewer than they did before. Ranges of motion and neurological status are intact." He assessed fibromyalgia and depression, stable. He told her to continue her medication and she could decrease her Amitriptyline to lessen morning somnolence. "I believe the patient is fit for return to work at this time, lifting fifteen pounds, but she should limit her stair climbing to twice per hour."

On June 16, 2000, plaintiff saw Dr. Karshner for a follow up (Tr. at 117). Plaintiff was working four hours a day and reported pain in her right neck base going into the shoulder and arm when she writes and sits. "She stopped Celexa about two weeks ago, and has not noted any change in mood." She was assessed with fibromyalgia; depression, no recurrence with stoppage of medication; and myofascial pain, neck and shoulder girdle, with trigger points. Plaintiff had a steroid injection but became nauseous. "The patient may work, lifting up to 20 pounds, working four to six hours a day, and climbing stairs no more than two to three times an hour."

On June 30, 2000, plaintiff saw Dr. Karshner for a follow up (Tr. at 116). Plaintiff continued to work four hours per day, but complained of continued pain. "Physical Examination today shows less tenderness in the 18 areas accepted as fibromyalgia tender points; ranges of motion and strengths are the same. The patient is neurologically intact." Dr. Karshner assessed fibromyalgia and depression. He started

Case 3:11-cv-05039-REL   Document 16   Filed 08/20/12   Page 21 of 49

her on Effexor (treats depression) and told her to continue her Norflex and Amitriptyline. "The patient may work six hours a day".

On August 4, 2000, plaintiff saw Dr. Karshner for a follow up (Tr. at 115). "She does better with the Norflex and Amitriptyline as they continue, she is on the Effexor. . . She continues to have pain, states that at some times she has difficulty walking. She is working about six hours a day maximum." Dr. Karshner performed a physical exam which showed "eight of the eighteen tender points today, which is less than necessary for fibromyalgia; the other ten are nontender today. Affect is flat. The patient does not look at the examiner during the examination or when talking." He assessed fibromyalgia type disorder, persistent but improving by examination; and depression. He increased her Effexor and told her to continue her other medications. "The patient will increase hours, when she returns in about two weeks I will have her up to seven hours per day. I will talk to the case manager today regarding case disposition."

On September 1, 2000, plaintiff saw Dr. Karshner and complained of continuing pain (Tr. at 114). "She continues to work, but has been on four hour days because she has to be home for her children, who come home at noon secondary to the heat." Plaintiff had more trigger points but appeared a little less depressed. "The patient will continue working, and work up to eight hours a day as tolerated; her weight restriction is raised to 25 to 30 pounds."

On September 13, 2000, plaintiff was seen by Deborah Asberry, RN, with complaints of head and chest congestion (Tr. at 167). She weighed 162.8 pounds. Plaintiff was diagnosed with acute bronchitis and was given an Albuterol treatment.

On October 25, 2000, plaintiff was seen at the Nevada Medical Clinic for nausea and diarrhea (Tr. at 133). Plaintiff had previously had an ultrasound and CT of the abdomen which were normal. "She does have some tenderness in the right lower quadrant, but definitely no rebound or guarding. No referred pain. She is just tender here." Plaintiff was diagnosed with gastroenteritis. "I suspect the patient has a viremia[11] and mesenteric adenitis.[12] Since the patient is afebrile [having no fever] with soft abdomen, negative lab and negative physical findings, I told her to stay on clear liquids and treat her viral infection."

On October 21, 2002, plaintiff went to the emergency room complaining of right lower quadrant pain (Tr. at 138-139). An abdominal series and pelvic ultrasound were normal except showed a small ovarian cyst. Plaintiff was given Demerol (narcotic) and Zofran (treats nausea and vomiting). She was started on Naprosyn (anti-inflammatory); and Russell Kemm, D.O., assessed pelvic pain, right ovarian cyst, and tobacco dependence. Plaintiff was given prescriptions for Naprosyn and Lorcet (narcotic) as needed for pain.

On January 10, 2001, plaintiff saw Deborah Asberry, RN, and complained of neck and back pain (Tr. at 161). "She has been in a long process of applying for disability or Workman's Comp. related injuries. . . . She is currently discussing the case with her

---

[11]The presence of viruses in the blood.

[12]Mesenteric adenitis, sometimes known as mesenteric lymphadenitis, refers to a condition in which the lymph nodes in the mesentery of the abdomen become inflamed. The mesentery is the tissue that connects the intestines to the internal lining of the abdominal wall. Inflammation of the mesenteric lymph nodes results in abdominal pain, tenderness and fever. The most common cause of mesenteric adenitis is a viral infection within the intestines.

23

attorney. She is unclear if today's visit should be on Workman's Comp or on her Medicaid Plus. . . . She sits in a slumped position today. . . . She is currently only on Norflex [muscle relaxer]. Has been out of anti-inflammatory and antidepressant for some time. Actually, she had told me back in September she had come off of these altogether and then states among the different providers she has seen, she had restarted briefly. She does not notice that great a relief from the anti-inflammatories, however. She does not seem to be opposed to using anti-inflammatories or antidepressants, but is basically really wanting Norflex. We discussed today probably the need to stay away from narcotic pain meds, as this is more chronic in nature. She is not exercising on any regular basis at the time and weight is still up."

Plaintiff had some positive trigger points and some muscle tenderness. Ms. Asberry assessed fibromyalgia and muscle spasm, cervical area, related to C5-C6 herniated disk with paresthesia[13] to the right upper extremity. She provided plaintiff with samples of Celexa[14] and a prescription for that medication, and she renewed plaintiff's prescription for Norflex. "Briefly discussed starting physical therapy for flexibility and strengthening. Also encouraged her to begin a walking program, yoga or other exercise program. Patient wants to hold on PT".

On February 27, 2001, plaintiff was seen by a nurse practitioner, Diane Valentine, with complaints of a headache, nausea, and abdominal cramping (Tr. at 160). Plaintiff

---

[13]A sensation of numbness or tingling on the skin.

[14]A selective serotonin reuptake inhibitor used to treat depression.

had some abdominal tenderness with no rebound or guarding.[15]  Urinalysis was normal;

complete blood count was normal.  Plaintiff was told to take Tylenol for her headache

and was given Phenergan for nausea.

Two and a half years later, on July 15, 2003, plaintiff applied for disability

benefits in the instant case.

On October 13, 2003, plaintiff was examined by DDS physician, Timothy

Sprenkle, D.O. (Tr. at 246-250).

> She has a clinical history of smoking one pack of cigarettes per day.  She smells like a lot heavier as far as my olefactory sense. I believe she has greater than 15 pack years of smoking.  She denies alcohol consumption. . . .
>
> She previously worked at Heartland Medical Center where she seemed to incur some type of workmen's comp injury which involved her neck and right upper extremity.  She was deemed to have a C-5 C-6 disc.  I see no radiographic test here at the time of examination, but apparently there was some type of herniated disc nerve impingement with right upper extremity radiculopathy.  During that workup she saw Dr. Deem, Dr. Ellefsen an Dr. Karshner for the workmen's comp.  She also has seen her family physician, Dr Russell Kemm.  Again, reviewing the medical records that I have present, patient does not seem to have received any epidural injections, did not receive EMG testing.  I do not have results of the MRI testing that she had on her neck area.  Patient is continuing with current neck type pain and discomfort that is now persistent in the right upper extremity as well as into the left upper extremity. . . .
>
> PAST MEDICAL HISTORY:  As stated above, history of her neck injury at Heartland in the year 2000, which has been worked up by Drs. Karshner, Ellefsen and Deem.  With some type of C-5, C-6 disc phenomena. Currently, there is no radiographic support during this examination.  Patient also has a medical history of fibromyalgia that was diagnosed by Dr. Karshner as well as her family physician, Dr. Russell Kemm.  Patient denies any other type of medical problems.  Other than her current pain and arthralgias [joint pain], she has chronic pain up

---

[15]Guarding occurs when a person subconsciously tenses the abdominal muscles during an examination. Voluntary guarding occurs the moment the doctor's hand touches the abdomen.  Involuntary guarding occurs before the doctor actually makes contact.  A doctor tests for rebound tenderness by applying hand pressure to a patient's abdomen and then letting go. Pain felt upon the release of the pressure indicates rebound tenderness.

and down her back as well as in her joints, predominantly in her hands and feet regions. . . .

GENERAL:  5'2", 162 pound white female.  She is 32 years of age.  Appears to be much older than her stated age. . . .

EXTREMITIES:  . . .  Grip strength is exceptionally poor.  She exhibits no effort at all at any grip or muscle strength testing.  I have to believe that at this time this patient is not putting any effort at all as she shows more strength when she walks than she does when pushing against my hand in strength resistance exercises. . . .  The hand can be fully extended as well as a fist being made with fingers put in opposition, however grip strength is exceptionally poor with exceptionally poor effort by this patient. . . .  She again, exhibits lower extremity weakness markedly, with very poor effort put into it.  Upon squatting, patient is unable to get back into standing position without help.  She is unable to relieve herself from forward flexion while standing down thru her ankles without help getting up.  Location of 10 or more points with fibromyalgia, patient seems to be tender everywhere that a finger is palpated on her body.  She exhibits no signs of not having any tenderness at any joint present. . . .  Patient did exhibit positive Tinels[16] and Phalen's sign[17] of the upper extremities.

MENTALLY:  Patient has extremely poor affect in the office.  Indeed, she seems to be down and depressed.  She does not smile, she does not show any infliction in her voice, it is rather monotone. . . .

IMPRESSIONS:
1.	Fibromyalgia
2.	Questionable history of C-5, C-6 cervical disc with radiculopathy unproven with lack of radiological documentation
3.	Chronic headaches

---

[16]Tinel's sign is positive when lightly banging (percussing) over the nerve elicits a sensation of tingling, or "pins and needles," in the distribution of the nerve. For example, in carpal tunnel syndrome, where the median nerve is compressed at the wrist, the test for Tinel's sign is often positive, eliciting tingling in the thumb, index, and middle fingers.

[17]Placing the backs of both hands together and holding the wrists in forced flexion for a full minute.  If this produces numbness or "pins and needles" along the thumb side half of the hand, the patient most likely has median nerve entrapment (Carpal Tunnel Syndrome).

4.    Endogenous depression[18]
5.    Tobacco addiction
6.    Bilateral carpal tunnel syndrome
7.    Gross obesity
8.    Possible Raynaud's phenomenon[19] vs RSD[20] vs Wagner's [sic] granuloma disease[21]
9.    Degenerative joint disease with osteoarthritis

This completes this disability physical at this time.  I believe this patient needs further neurosurgical workup, if possible neurological workup as well as psychiatric counseling.  She currently needs bilateral EMG testing [for carpal tunnel syndrome] as well as a recurrent MRI, a review of her MRI results. Possibly a current lab work to review her cholesterol values, and she needs to place herself on a weight loss diet as well as smoke cessation.  She exhibits very poor work effort, I believe this could be improved with use of psychiatric counseling and for care of her fibromyalgia.

A year later, on October 14, 2004, plaintiff had an MRI of the cervical region due to complaints of paresthesias in both arms (Tr. at 289).  Mild bulging of C5-6 an C6-7 was noted.  Very minimal bulging of C4-5 was noted.  "[N]o true spinal stenosis [narrowing] is seen.  The spinal cord itself appears normal."

---

[18]A type of depression caused by an intrinsic biological or somatic process rather than an environmental influence, in contrast to a reactive depression.

[19]Raynaud's phenomenon is a condition in which cold temperatures or strong emotions cause blood vessel spasms that block blood flow to the fingers, toes, ears, and nose.

[20]Reflex sympathetic dystrophy ("RSD") is a condition that features a group of typical symptoms, including pain (often "burning" type), tenderness, and swelling of an extremity associated with varying degrees of sweating, warmth and/or coolness, flushing, discoloration, and shiny skin.

[21]Wegener's granulomatosis ("WG") is a rare disease of uncertain cause. It is characterized by inflammation in a variety of tissues, including blood vessels (vasculitis). Inflammation damages vital organs of the body.  WG primarily affects the upper respiratory tract (sinuses, nose, trachea [upper air tube]), lungs, and kidneys. Any other organ in the body can be affected as well.

On October 26, 2004, David Paff, M.D., examined plaintiff at the request of the

Division of Family Services (Tr. at 301-302).

> HISTORY: . . . She last worked in 2000 for Heartland Hospital in housekeeping
> for one year. Prior to that she worked in a restaurant doing dishes. She
> apparently needed light duty and there was none, so she was terminated. She has
> never used illegal drugs or alcohol. She has smoked a pack of cigarettes a day for
> 20 years.
>
> * * * * *
>
> She had a neck injury in 1999 while picking up laundry. She saw a Workers'
> Compensation doctor and currently is seeing a neurosurgeon in Columbia. She
> has been told that she has a pinched nerve. She had an MRI that showed a
> protruding disc. There was no recommendation for surgery. She has been given
> Flexeril and may have epidurals. The pain comes and goes. . . . She has
> complaints of pain in her knees, legs, feet, and arms, which comes and goes,
> especially with changes in the weather. . . . She is not depressed -- she just feels
> tired. She was given a diagnosis of fibromyalgia in 2000. She has frequent
> headaches in the posterior neck and occiput [back of the head]. She also has
> headaches below her left ear and does have some dizziness and nausea with the
> headaches. She has abdominal pain that comes and goes.
>
> * * * * *
>
> MEDICATIONS: Amitriptyline, Naprosyn, and Flexeril.
>
> PHYSICAL EXAMINATION: Examination reveals a pleasant, cooperative, obese
> lady in no distress.

(Tr. at 301).

Plaintiff weighed 170 pounds and was 5'2" tall (Tr. at 301). Dr. Paff observed that

plaintiff moved very slowly and appeared quite sad. She was able to walk on her toes

and squat 50% of normal but with pain. She had good range of motion in her

lumbosacral spine, cervical spine and shoulders. She was tender "every place I touch

her, including the areas for fibromyalgia, but much more." She had very weak grips:

"She does not appear to be trying." X-ray of plaintiff's cervical spine was normal. She

28

had increased triglycerides (365)[22] and decreased HDL (21).[23]  Pulmonary function testing was normal.

> SUMMARY: . . .  She may have fibromyalgia, but it hurts every place that I touch her, which is of concern as to validity.  She had a neck injury in 1999.  I doubt if she is ever going to be able to work.  She is disabled.

(Tr. at 302).

On November 8, 2004, plaintiff saw Shahzad Khan, M.D., for a follow up on tingling in her arms (Tr. at 311-312).  Plaintiff had a nerve conduction study which showed evidence of mild left ulnar neuropathy[24] at the elbow.  An MRI of her cervical spine showed mild degenerative joint disease.  "She has almost constant neck pain and has been having headaches for about 5+ years.  She denies any radiation of her neck pain to her extremities.  She occasionally notices some numbness and tingling of her upper extremities.  Her headaches usually occur a least 2-3 times in a week."

Dr. Khan performed a physical exam.  He observed plaintiff to be pleasant, slightly obese, alert, oriented, with a good attention span.  She had normal coordination, normal gait, and normal station.  Her motor strength was good.  Dr. Kahn assessed

---

[22]A type of fat in the blood. Normal is below 150.

[23]High-density lipoproteins. These lipoproteins are often referred to as "good," cholesterol. They act as cholesterol scavengers, picking up excess cholesterol in the blood and taking it back to the liver where it is broken down. The higher the HDL level, the less "bad" cholesterol there will be in the blood.  Normal for women is between 40 and 60, but above 60 is desirable. Exercise increases HDL.

[24]Ulnar neuropathy is an inflammation or compression of the ulnar nerve, resulting in paresthesia (numbness, tingling, and pain) in the outer side of the arm and hand near the little finger.

29

cervical spondylosis[25] and migraine headache without aura.[26]  He prescribed

Neurontin,[27] and told her to use Migraine Excedrin or Lodine[28] for her headache.

Two years later, on November 1, 2006, plaintiff underwent an overnight sleep

study (Tr. at 577). Afterward she was diagnosed with restless legs syndrome and

physiological sleep disorder not otherwise specified.  "This sleep study does not

demonstrate significant sleep apnea or other specific abnormalities. . . . [S]leep

efficiency was normal without significant wakefulness after sleep onset. . . .  Further

evaluation of restless legs is warranted, although periodic limb movements were not

demonstrated.  The patient should be cautioned with regard to driving or operating any

hazardous machinery until daytime sleepiness can be resolved."

About eight months later, on June 26, 2007, plaintiff was seen at Nevada

Regional Medical Center by Russell Kemm, D.O., after coming to the emergency room

for dehydration (Tr. at 604-605).  She was given IV morphine (narcotic) and IV

Toradol[29]  and started on a full liquid diet.  A CT of her abdomen and pelvis were

obtained which were normal, as was her blood work.  "Her affect was extremely flat at

---

[25]Cervical spondylosis is caused by chronic wear on the cervical spine. This includes the disks or cushions between the neck vertebrae and the joints between the bones of the cervical spine. There may be abnormal growths or "spurs" on the bones of the spine (vertebrae).

[26]"Migraine without aura" is a relatively new name for the most common type of migraine headache.  It is also called a common migraine.  These migraines do not have an aura. Aura is the name for early unusual symptoms some people notice shortly before a migraine starts.

[27]Treats seizures and nerve pain.

[28]A non-steroidal anti-inflammatory.

[29]A non-steroidal anti-inflammatory.

the time of discharge. She was advised of the normality of her x-rays and lab work. She was advised of the elevated glucose [blood sugar] and was offered counseling regarding this which she did decline." No medications were prescribed. "It was emphasized at great length the need to avoid concentrated sweets, the impact of metabolic syndrome[30] and the possibility of the development of diabetes. She was totally reluctant to discuss any dietary intervention."

## V.    FINDINGS OF THE ALJ

Administrative Law Judge Susan Blaney entered her opinion on September 30, 2008 (Tr. at 394-403).

Plaintiff's insured status expired on March 31, 1999, which is before her alleged onset date of disability (Tr. at 395, 396-397, 663-668).

Step one. Plaintiff has not engaged in substantial gainful activity since her alleged onset date (Tr. at 397). She earned $832 in 2000 which is below the substantial gainful activity level (Tr. at 397).

Step two. Plaintiff has the following severe impairments: neck and back problems since a 1999 work injury, recent vomiting and diarrhea problem and fibromyalgia (Tr. at 397). Plaintiff's mental impairment is not severe (Tr. at 399).

---

[30]Metabolic syndrome is a name for a group of risk factors that occur together and increase the risk for coronary artery disease, stroke, and type 2 diabetes. Researchers are not sure whether the syndrome is due to one single cause, but all of the risks for the syndrome are related to obesity. The two most important risk factors for metabolic syndrome are extra weight around the middle and upper parts of the body and insulin resistance, in which the body cannot use insulin effectively. Insulin is needed to help control the amount of sugar in the body. As a result, blood sugar and fat levels rise.

Step three.  Plaintiff's impairments do not meet or equal any listed impairments (Tr. at 397-398, 400).  "At the hearing, claimant, by and through her attorney, stated she was not contending her condition meets or medically equals any listing.  Moreover, as noted above, the medical expert testified that the claimant's impairments do not meet or equal a listing." (Tr. at 400, 663).

Step four.  Plaintiff has the residual functional capacity to perform light and sedentary work.  She can stand and/or sit for six hours a day, she can lift 20 pounds occasionally and 10 pounds frequently, she cannot work in extremes of temperature or excessive humidity (Tr. at 400).  With this residual functional capacity, plaintiff can perform her past relevant work as a hospital cleaner and nursing home cleaner at the light level (Tr. at 402).

Step five.  Even if plaintiff were not able to perform her past relevant work, she could work as an order clerk, an optical goods assembler, or a credit checker, all available in significant numbers (Tr. at 402-403).

## VI.    SCOPE OF AUTHORITY ON REMAND

Plaintiff argues that the remand order issued by Judge Laughrey on June 13, 2006, directed the Commissioner to reconsider the evidence regarding plaintiff's fibromyalgia only, and that the ALJ erred in reviewing plaintiff's entire case.

> The reason for remand is important because it holds all other determinations made by the first ALJ to be the law of the case.  Of importance is the findings made by the first ALJ regarding Plaintiff's severe impairments and the relative restrictions. The first ALJ found that Ms. Stone had severe impairments of cervical spondylosis and major depressive disorder.  She also determined that Plaintiff was additionally limited to no significant unprotected heights; no potentially dangerous and/or unguarded moving machinery; no commercial driving; no exposure to extreme vibration; even surfaces on which to walk; simple, repetitive, (1-3 step instructions); and no public contact.

>These restrictions are important because they rule out Plaintiff's ability to perform the work found suitable by the ALJ (home cleaner, order clerk, optical goods assembler, and credit checker).

Plaintiff offers no legal authority for her position that an ALJ, on remand, has the extreme restrictions set out in plaintiff's brief.

The Law of the Case doctrine prevents settled issues from being relitigated. VanderMolen v. Astrue, 630 F. Supp.2d 1010 (S.D. Iowa 2009), United States v. Bartsh, 69 F.3d 864 (8th Cir. 1995). However, for an issue to be "settled," the court must have made a ruling. In this case, there were no factual findings made by the court, nor did the Commissioner concede any issues. In fact, the district court reversed and remanded this case simply for "further proceedings." The prior administrative decision was vacated, meaning that it was rescinded and is no longer in effect. Therefore, it was not error for the ALJ to review the record and address the evidence.

On June 13, 2006, the district court granted Commissioner's June 9, 2006, motion to remand. In granting the Commissioner's motion, Judge Laughrey recognized that the ALJ would reconsider the evidence concerning plaintiff's fibromyalgia "and related issues." (Tr. at 418). Judge Laughrey then reversed and remanded the case simply "for further proceedings." Therefore, the district court did not rule on any facts, and no issues were settled by a reversal and remand "for further proceedings." The Law of the Case doctrine simply does not apply here.

On August 18, 2006, the Appeals Council vacated ALJ Linda Carter's decision and remanded the case, which was subsequently assigned to ALJ Susan Blaney, to make clear findings regarding whether plaintiff's fibromyalgia is a medically determinable impairment and, if so, whether it is a "severe" impairment as defined in the

Commissioner's regulations. The ALJ was further directed to state what credible limitations resulted from plaintiff's fibromyalgia. The Appeals Council ordered the ALJ to take "appropriate action" to resolve the issues surrounding plaintiff's fibromyalgia, as well as any other issues the ALJ found appropriate, in accordance with applicable Social Security Administration regulations and rulings (Tr. at 423). The Appeals Council stated that the ALJ should obtain updated medical records from treating and other medical sources, including clinical findings, test results, and medical source statements about what plaintiff could do despite her impairments. The ALJ was instructed that if the evidence did not adequately clarify the record, she should recontact the medical source(s) for further information. Finally, the Appeals Council stated that the ALJ should, if necessary, obtain a consultative physical and/or mental status examination, including a medical source statement. The ALJ was further instructed to obtain evidence from a medical expert to clarify the nature and severity of plaintiff's impairment, if necessary. Supplemental vocational expert evidence was ordered, if warranted by the expanded record. The ALJ in this case complied with the Appeals Council's directives. Therefore, plaintiff's motion for judgment on this basis will be denied.

## VII.   CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible. She states that the ALJ improperly discounted her testimony that she can only sit for 15 to 20 minutes at a time "because she 'sat at the hearing for about an hour before she stood up,' and after showering in the morning, "she sits for 30 minutes with her feet up.'" Plaintiff then estimates that the hearing lasted about 45 minutes because "most hearings are set for one-hour intervals", and plaintiff asked if she could stand up

Case 3:11-cv-05039-REL   Document 16   Filed 08/20/12   Page 34 of 49

on page 27 of a 62-page transcript. Therefore, when the estimated 45-minute hearing is divided in half (22.5 minutes), and plaintiff asked to stand up BEFORE the halfway mark of the transcript, then she likely asked to stand up at the "20-minute mark, which is perfectly consistent with her statement."

Plaintiff's argument is without merit. The attorney drafting plaintiff's brief was not the same attorney at the administrative hearing. The ALJ was there, and therefore the ALJ made a finding consistent with her own observation during the hearing. Additionally, I note that plaintiff was able to sit with a disability counselor for an hour and a half without standing -- a note that was specifically written on the administrative form. Plaintiff would not need to ask permission to stand in such a situation; therefore, it can be assumed that her sitting for 90 minutes without standing up was because she was perfectly capable of doing so. On February 2, 2005 -- five and a half years after her alleged onset date -- she testified that she can sit for 30 minutes at a time.

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the

court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion, and additionally states that the following factors should be considered: Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board).

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

> [C]laimant has very low earnings during her life. Her highest annual earnings are $4565 which she earned in 1998. Her next highest annual earnings are $4106 in 1995. Other years show earnings of $2500 or less. Thus, claimant bas been essentially out of the work force, or participated marginally for many years without any allegation of disability which does not support a finding that she is highly motivated to work.

Case 3:11-cv-05039-REL   Document 16   Filed 08/20/12   Page 36 of 49

\* \* \* \* \*

[C]laimant testified that she filed a workers' compensation claim as a result of her job injury in 1999, for which she received an 8.2% whole body rating according to Exhibit 3D, page 4. This low rating does not support an allegation of inability to perform all work. She further testified that she has not been to the Missouri Department of vocational Rehabilitation.

\* \* \* \* \*

The claimant has a poor earnings record which indicates that the claimant may have low motivation to work. She also testified that she has not even tried to do a sit down job, adding that just sitting hurts her back and legs and she has to have her feet propped up. However, nothing in the record supports these significant restrictions.

While the claimant complains of severe back pain, neck "episodes," and arthritic pain, physical examination in January 2006 showed no swelling or synovitis of any joints and full muscle strength of all limbs. Also, all laboratory tests were normal. Moreover, treatment notes and continuous use of medications indicate that her symptoms are adequately treated with medication. The rheumatologist at the University of Missouri who examined the claimant in January 2006 advised the claimant to increase aerobic exercise and recommended physical therapy and myofascial stretching exercises, which the claimant declined. The doctor also stated that the claimant would benefit from muscle strengthening and range of movement exercises for her neck and low back pain, but apparently the claimant has not done this. The claimant's failure to follow prescribed medical treatment is inconsistent with complaints of disabling pain. Without good reason, failure to follow prescribed treatment is grounds for denying an application for benefits. Roth v. Shalala, 45 F.3d 279, 282 (8th Cir. 1995). Furthermore, no treating doctor has opined restrictions for the claimant. The medical expert opined that the only limitation supported by the medical records and objective evidence is that the claimant should not work in environments with dampness, excessive heat or excessive cold, as these environments exacerbate chronic pain syndrome.

At the hearing, the claimant testified that she was bothered by headaches three to four times a week. However, this allegation is inconsistent with the medical records which indicate only sporadic treatment for headaches. She is treated with Skelaxin, which helps in alleviating her headaches. Overall, the undersigned finds that the claimant's subjective complaints are out of proportion to the objective findings in this case.

At the hearing, claimant testified that her condition has worsened since 1999 in that she has more pain now in her feet, arms, and hips. This has been the case

since 2002 according to her testimony. She cannot now lift more than one-half gallon of milk and can sit only 10 to 15 minutes before she has to stand up. It hurts to bend over and thus she has to squat or sit down to pick something up off the floor. She is a smoker but has no difficulty breathing according to her testimony.

With regard to her activities of daily living, she awakens at 6:00 AM to get her kids off to school. They are ages 14, 16 and 17, and all three live at home with her. She then takes her medicine and lays [sic] down until 9:30 AM because her medication makes her drowsy. She takes a shower and then sits for 30 minutes with her feet up due to problems walking. She sometimes does the dishes but does not cook, her husband does that. She straightens the house and tries to dust. The kids vacuum. She drives an automobile with the furthest distance she has driven in the last year being 8 miles. She attends some school functions and goes shopping with her children. She does not crochet anymore, nor does she go fishing with her children. Her husband takes them fishing now because it hurts her back and legs to go fishing.

Claimant's description of her activities of daily living do not preclude the performance of sedentary work. Furthermore, the overall evidence indicates that the claimant is physically capable of at least light work. While the claimant stated that she can only sit for 10 to 15 minutes, she sat at the hearing for about an hour before she stood up. In addition, even though she testified that she could only sit for 10 to 15 minutes, she later said that, after she takes a shower in the morning, she sits for 30 minutes with her feet up. This testimony is inconsistent with the earlier allegation that she could only sit 10 to 15 minutes.

(Tr. at 397-399, 400-401).

Plaintiff's administrative hearing testimony included the fact that in September 1999 -- her alleged onset date -- she was not having problems with her legs, knees, arms or hips, but her feet hurt (Tr. at 693-694). She also testified that her condition started affecting her in 2002 -- three years after her alleged onset date. Plaintiff testified that her hip pain is a 10 out of 10 in severity, yet the ALJ did not note any distress during the hearing and in nearly all of plaintiff's medical records she was described as being in no apparent distress. Clearly she exaggerated the severity of her pain. Plaintiff testified that she has five to six bad days per week, and that on bad days her pain is a 10 out of 10

in severity. Yet if that were true, one would expect to see either a lot of canceled medical appointments due to such severe pain or doctors observing that plaintiff appeared to be in great distress due to such severe pain. Neither happened.

Plaintiff does not exercise, even though she has been told by her treating doctors that exercise will help her condition. Plaintiff refused to participate in physical therapy as recommended by her rheumatologist. For nearly a year, she was released to return to work but did not for a long period of time and even when she did return to work she worked fewer hours than the doctor said she could because she had to be home for her children. Plaintiff has incredibly low earnings during her entire adult life, with $4,565.39 being her top earnings for any year. She earned more than $2,000 in only five years from 1987 through 2004. The ALJ noted that plaintiff's earnings record suggests that she has never been motivated to work outside the home and that suggests that her failure to work now is based on something other than her medical condition.

Plaintiff's physical exams were essentially normal: In January 2000, Dr. Karshner found her exam essentially normal but noted that plaintiff showed significant anger and frustration during the appointment which had been set up by an attorney. Her MRI was normal other than a disc bulge; her lab work was all normal. She did not accept Dr. Karshner's diagnosis or treatment plan, which included physical therapy. In March 2000 plaintiff's physical exam was normal other than tender points. In April 2000 plaintiff had been out of her medications but did not call her doctor. Instead she went to the emergency room and got a narcotic. Her physical exam was normal except tender points.

In May 2000, after plaintiff had been back on her medications, she had fewer tender points and overall felt better. In June 2000 plaintiff was working four hours per day and her tender points were "less tender". By August 2000 (almost a year after her alleged onset date) she was working six hours a day and had only eight tender points, which is fewer than that required for a diagnosis of fibromyalgia.

In October 2005, a doctor at the Nevada Medical Clinic noted that her ultrasound and CT of the abdomen were normal. In January 2001, it was noted that plaintiff had been out of her medications "for some time." She was still not exercising as recommended by her doctors. She was told to begin a walking program, yoga or other exercise program, but she did not.

In October 2003 -- four years after her alleged onset date -- plaintiff saw a DDS physician, Dr. Timothy Sprenkle, in connection with her disability case. Dr. Sprenkle noted that plaintiff was not putting any effort at all into grip strength testing. "She shows more strength when she walks than she does when pushing against my hand in strength resistant exercises." He noted that she put forth very poor effort in all of the testing. Dr. Sprenkle told plaintiff she needed to lose weight and stop smoking. "She exhibits very poor work effort."

A year later, in October 2004, plaintiff's MRI showed only "very minimal" bulging of C4-5 and "mild" bulging of C5-6 and C6-7. Her spinal cord was normal. Later that month she told Dr. Paff (who saw her in connection with her disability claim) that her pain "comes and goes" and that she "is not depressed." Dr. Paff observed that plaintiff was pleasant, cooperative, and in no distress. Dr. Paff, like Dr. Sprenkle, noted that plaintiff was not trying at all during grip strength testing. Dr. Paff observed that "it

40

hurts every place that I touch her, which is of concern as to validity." Despite finding that plaintiff was not trying while being tested, and that she hurt every place he touched her which he clearly did not believe based on his other comments, Dr. Paff said that he doubts if she will ever be able to work. He did not indicate any functional restrictions or any testing that supported that. And he is the only doctor who made such a statement in this voluminous record.

A week after plaintiff saw Dr. Paff, she was examined by Dr. Khan (a treating doctor) who observed that she was alert, oriented, pleasant and with a good attention span. She had normal coordination, normal gait, normal station and normal motor strength -- even though a few days earlier plaintiff tried to appear to have significantly less strength when being examined in connection with her disability claim.

In November 2006 plaintiff was diagnosed with restless leg syndrome even though "period limb movements were not demonstrated" during a sleep study. Finally, when plaintiff went to the emergency room for dehydration, she was found to have metabolic syndrome (i.e., pre-diabetes) and was offered counseling on dietary changes to avoid diabetes, which she was "totally reluctant to discuss."

The medical records clearly do not corroborate plaintiff's allegations of severe disabling pain on a constant basis. She presented herself differently to doctors examining her for treatment versus for her disability case. She was consistently in no distress which completely contradicts her testimony of suffering from the worst possible pain on a daily basis. She exaggerated her limitations when being tested in connection with her disability case. When evaluating a claimant's alleged disability, it is proper to consider a claimant's uncooperative or exaggerated responses during a medical

41

examination.  <u>Brown v. Chater</u>, 87 F.3d 963, 965 (8thCir. 1996)(the plaintiff exaggerated problems during testing).

The ALJ properly discounted plaintiff's subjective complaints; therefore, plaintiff's motion for summary judgment on this basis will be denied.

## VII.   MENTAL IMPAIRMENT

Plaintiff argues that the ALJ failed to develop the record with regard to plaintiff's mental impairment.  "[T]he ALJ failed to obtain additional medical evidence as to whether Plaintiff me Listing 12.07.  The Medical Expert, Robert Karsh, MD, testified that Plaintiff's fibromyalgia was closest to Listing 12.07, regarding somatoform disorder, because fibromyalgia dealt with depression and stress."

The ALJ found that plaintiff's mental impairment is not severe:

> [T]he undersigned finds that the claimant has no severe mental impairment.  The claimant has never been hospitalized for mental symptoms and was treated by a mental health professional for anxiety/depressed mood for only about 4 months in 2007.  Exhibit 17E indicates that she has taken mild anti-depressant medications for about two years.  Her continued use of these medications suggests that they are effective in treating her symptoms.  Furthermore, the State agency psychologists have indicated that the claimant has no severe mental impairment.  Based on these factors, the undersigned finds the claimant has no severe mental impairment.  Specifically, the claimant's mental symptoms cause no restriction of activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation, each of extended duration.

(Tr. at 399).

Plaintiff did not allege a mental impairment as a basis for disability.  In January 2006 -- five and a half years after her alleged onset date -- plaintiff denied any history of anxiety or depression.  Plaintiff's medical records show that she was treated for depression for about four months in 2007.  Kenneth Burstin, Ph.D., concluded that

plaintiff did not have a severe mental impairment.  Dr. Karsh, the medical expert who testified at the hearing, stated that fibromyalgia's "closest relative" was somatoform disorder because both are conditions for which there are no objective findings and they are associated with depression and stress.  Dr. Karsh did not testify that there was evidence that plaintiff suffers from somatoform disorder -- he used the disorder to explain how fibromyalgia is a diagnosis without objective findings.

Reversal due to failure to develop the record is only warranted when such a failure was unfair or prejudicial.  Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005); Shannon v. Chater, 54 F.3d 484, 488 (8th Cir. 1995).  Plaintiff did not allege a mental impairment as a basis for disability, and the record fails to indicate that a severe mental impairment exists.  Instead, the record includes a finding by a clinical psychologist that plaintiff's mental impairment is not severe.  The ALJ is only required to order additional medical evidence when the evidence as a whole, both medical and nonmedical, is not sufficient to make a disability determination.  20 C.F.R. §§ 404.1519a and 416.919a.  That was not the case here.  Therefore, plaintiff's motion for judgment on this basis will be denied.

## VIII.  IMPACT OF PLAINTIFF'S OBESITY

Plaintiff argues that the ALJ erred in failing to evaluate the severity of plaintiff's obesity on her ability to work.  The consultative examiner, Dr. Sprenkle, did not assess work-related functional restrictions due to obesity.  Dr. Sprenkle did, however, note that plaintiff was "not putting any effort at all" into strength testing.  Dr. Paff also noted that plaintiff was not trying at all during strength testing and that she claimed to hurt every place he touched her which essentially invalidated the testing.  There were no range of

motion limitations due to obesity noted in any medical record, nor was there any difficulty walking indicated by any doctor. Moreover, no other treating or examining physician assessed any limitations due to obesity. In June 2007 -- almost eight years after plaintiff's alleged onset date -- Dr. Kemm stated that plaintiff could "walk as far as she desires." SSR 02-01p provides that obesity will be considered a severe impairment when it significantly limits a claimant's ability to perform basic work activity. There is no evidence of any functional limitations due to obesity here, either in the medical records or in plaintiff's own testimony. Therefore, plaintiff's motion for judgment on this basis will be denied.

## IX.   *PLAINTIFF'S RESIDUAL FUNCTIONAL CAPACITY*

Plaintiff argues that the ALJ erred in failing to restrict plaintiff's residual functional capacity on the basis of her diarrhea problem and her neck and back problems. The ALJ found that plaintiff had a "recent vomiting and diarrhea problem". The ALJ noted that plaintiff first complained of vomiting and diarrhea in 2001, which is after her alleged onset date. In 2002 she complained once of right lower quadrant pain. She did not again complain of vomiting and diarrhea until late 2007 (dehydration) and early 2008 (gastroenteritis). Plaintiff also argues that the ALJ improperly relied on the testimony of Dr. Karsh and ignored the medical opinion of Dr. Paff who stated that he doubted plaintiff would ever be able to work.

Preliminarily, I note that Dr. Paff also stated that plaintiff did not give any effort at all when participating in strength testing, and that because she claimed to hurt every place he touched her, the testing was not valid. His conclusion at the end that he doubted she would ever work was not supported by anything other than plaintiff's

apparently lack of motivation to work and her strong motivation to appear to be in much worse condition than she really was.

The ALJ found that plaintiff maintained the residual functional capacity to perform light and sedentary work which involved standing and/or sitting six hours daily, lifting 20 pounds occasionally and 10 pounds frequently. She found that plaintiff could not work in temperature extremes or around excessive humidity. It is the responsibility of the ALJ to determine a claimant's residual functional capacity based on all of the relevant evidence including medical records, observations of treating physicians and others, and plaintiff's own description of her limitations. 20 C.F.R. §§ 404.1545, 404.1546, 416.945, and 416.946; McKinney v. Apfel, 228 F.3d 860, 862 (8th Cir. 2000); Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995). In this case, the ALJ's residual functional capacity finding is supported by medical evidence from treating physician, Matthew Karshner, M.D.; the testifying medical expert, Robert Karsh, M.D.; and reviewing physician, Van Kinsey, D.O. The ALJ's residual functional capacity determination was also influenced by her determination that plaintiff's allegations were not credible. Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005).

Contrary to plaintiff's argument, the ALJ's decision shows that all of plaintiff's alleged impairments were addressed. The ALJ first incorporated by reference the prior ALJ's summary of the evidence, although not the prior ALJ's decision. The ALJ then discussed all of plaintiff's credible complaints, including fibromyalgia, neck and back problems, abdominal pain, and obesity. The ALJ discussed the testimony of Dr. Robert Karsh, a board certified physician in internal medicine and rheumatology and a teacher in clinical rheumatology at Washington University School of Medicine. Dr. Karsh

Case 3:11-cv-05039-REL   Document 16   Filed 08/20/12   Page 45 of 49

detailed the evidence related to plaintiff's fibromyalgia, vomiting, diarrhea,

gastroenteritis, depression, and cervical spine. Dr. Karsh explained that fibromyalgia is

a disorder of unknown cause which is characterized by achy pain, stiffness, and soreness

in muscles and areas of the tendon insertions and soft tissue. The condition is

exacerbated by environmental or emotional stress, poor sleep, trauma, exposure to

dampness or cold, or by a physician telling a patient that his condition is "all in his

head." Dr. Karsh further explained that the leader of the group that discovered

fibromyalgia, Dr. Frederick Wolf, stated in a January 2008 New York Times article that

although fibromyalgia was initially identified as a disease, it is actually a chronic pain

syndrome that is closely related to stress. Dr. Karsh stated that the limitations an

individual experienced due to fibromyalgia essentially rested upon a credibility

assessment of that person's subjective complaints. In this case, Dr. Karsh stated that the

objective findings did not meet the requirements of a listed impairment, and plaintiff

had no limitations aside from limitations dealing with dampness and excessive heat and

cold, all of which exacerbate chronic pain syndromes.

Upon assessing the evidence taken as a whole, the ALJ properly granted great

weight to Dr. Karsh's expert testimony and opinion, which included an assessment of all

of plaintiff's medically supported impairments.

Plaintiff argues that Dr. Karsh's opinion is contrary to other evidence of record,

specifically Dr. Paff's statement that plaintiff was "disabled." Dr. Paff observed that

plaintiff had good range of motion in her shoulders, cervical spine and lumbosacral

spine. He observed that x-rays of her cervical spine were unremarkable. He observed

that plaintiff did not appear to be trying during grip testing, and he questioned the

validity of the physical exam because plaintiff claimed to hurt every single place he touched her. Dr. Paff then stated that he doubted plaintiff would ever be able to work and that she was disabled. Clearly there is no support whatsoever for that conclusion.

Dr. Sprenkle also questioned the credibility of plaintiff's complaints and noted that she did not try at all during grip testing.

A treating physician's conclusion that plaintiff is disabled receives no deference because a finding of disability is one reserved for the Commissioner. House v. Astrue, 500 F.3d 741, 744 (8th Cir. 2007). The determination that a claimant is "disabled" or "unable to work" involves an issue reserved to the Commissioner and is not the type of "medical opinion" to which the Commissioner gives controlling weight. Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005)(citing Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004)). Rather, the ultimate decision as to whether a claimant is disabled is made by the Commissioner. 20 C.F.R. §§ 404.1527(e)(1) and 416.927(e)(1); Flynn v. Chater, 107 F.3d 617, 622 (8th Cir. 1997). "Although medical source opinions are considered in assessing RFC, the final determination of RFC is left to the Commissioner." Ellis v. Barnhart, 392 F.3d 988, 994 (2005) (citing 20 C.F.R. § 404.1527(e)(2)).

Contrary to plaintiff's claim, the ALJ's decision is consistent with the standard for evaluating pain and other subjective complaints as set forth in the regulations at 20 C.F.R. §§ 404.1529 and 416.929. A claimant's statement about pain or other symptoms does not, by itself, establish disability. 20 C.F.R.§§ 404.1529 and 416.929. There must be medical signs and laboratory findings showing a medical impairment which could reasonably be expected to produce the symptoms alleged and which, when considered

with all of the other evidence, would lead to the conclusion that the claimant is disabled. Id. Although "[c]onsistent diagnosis of chronic . . . pain, coupled with a long history of pain management and drug therapy," may be viewed as an "objective medical fact," the evidence in this case, including questions of validity by physicians, fails to support plaintiff's claim. O'Donnell v. Barnhart, 318 F.3d. 811, 817 (8th Cir. 2003); Cox v. Apfel, 160 F.3d 1203, 1208 (8th Cir. 1998).

   In September 2000, treating physician Matthew Karshner, M.D., stated that plaintiff could work up to eight hours a day, with a 25- to 30-pound lifting restriction. In June 2007, Russell Kemm, D.O., noted that plaintiff could walk "as far as she desires." This treating physician opinion evidence provides support for the ALJ's decision. As the ALJ noted, plaintiff received only a 8.2 percent whole body disability rating as the result of a worker's compensation claim. While not binding on the Commissioner, this evidence was properly considered. See Morrison v. Apfel, 146 F.3d 625, 628 (8th Cir. 1998).

   The record shows that although plaintiff alleged disability beginning September 1, 1999, she continued to work until August 1, 2000. The evidence of record fails to reveal a deterioration in plaintiff's condition after she stopped working. Comstock v. Chater, 91 F.3d 1143, 1147 (8th Cir. 1996)(the plaintiff's work activity belied his claim of disabling pain). Work performed during any period in which plaintiff alleges that she was under a disability is evidence of an ability to engage in substantial gainful activity. See 20 C.F.R. §§ 404.1571 and 416.971.

   Because the ALJ properly evaluated the medical opinions of the treating, examining and reviewing doctors, and because the ALJ properly discounted plaintiff's

subjective complaints of disabling pain, plaintiff's motion for judgment on the ground that the ALJ improperly formulated plaintiff's residual functional capacity will be denied.

## X.    CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled.  Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied.  It is further

ORDERED that the decision of the Commissioner is affirmed.


/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
August 20, 2012

49